# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## ADRIAN LAMONT HENRY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010D3439      Cheryl A. Blackburn, Judge**

_____

### No. M2014-00034-CCA-R3-PC - **Filed December 5, 2014**

_____

The petitioner, Adrian Lamont Henry, pled guilty to second degree murder, a Class A felony, and was sentenced to forty years in confinement. The petitioner filed the instant petition for post-conviction relief, in which he alleged that he received the ineffective assistance of counsel and that his guilty plea was involuntary. Following an evidentiary hearing, the post-conviction court denied relief. On appeal, the petitioner argues that his constitutional rights were violated when he was not given proper *Miranda* warnings and when he was interviewed while under the influence of marijuana. The petitioner also argues that he received ineffective assistance of counsel when trial counsel: (1) failed to communicate the defense strategy, defenses, or theory of the case with the petitioner; (2) failed to file a motion to suppress the petitioner's statements to law enforcement; (3) failed to utilize important witnesses; and (4) pressured the petitioner into pleading guilty. The petitioner argues that due to these errors, his guilty plea was not knowingly and voluntarily entered. After our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROGER A. PAGE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jennifer J. Hall, Nashville, Tennessee, for the appellant, Adrian Lamont Henry.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

The petitioner was indicted for first degree, premeditated murder and arson after police officers discovered his girlfriend's body burning in a field and her vehicle burning nearby. On January 11, 2012, the petitioner pled guilty to second degree murder and was sentenced to forty years in confinement to be served at 100% and consecutively to his prior convictions. The arson charge was dismissed.

### A. Facts from Guilty Plea Submission Hearing

At the guilty plea submission hearing, the petitioner agreed that the following recitation of facts was "generally true":

> [O]n Thursday, August the 12th, 2010, Metro police officers responded to a report of what appeared to be a human body on fire near the intersection of Brick Church Lane and Knight Drive here in Davidson County. Upon the officers' arrival[,] they discovered the charred, burning remains of what appeared to be an adult female. Detectives responded to the scene along with I.D. and the medical examiner's office. Also while investigating this death[,] detectives were advised that a van had been discovered burned approximately two miles from the scene where the body was discovered. The van was registered to a Mr. Rat, R-A-T, Vit, V-I-T. And it was determined that his daughter Saret Vit[,] who is age twenty-two[,] was the last person known to be driving the van.
>
> An autopsy was conducted and performed, and through dental records[,] it was determined that the body found burn[ed] was that of Saret Vit. Through speaking with her employer and family[,] the last person to have been seen with Ms. Vit was her boyfriend, Adrian Henry. Evidence from the autopsy showed that Ms. Vit suffered trauma to her head. The cause of death was strangulation, and it was determined that she was deceased at the time her body was set on fire.
>
> Based on information from the fire marshal's office[,] an accelerant gasoline was used to start the fire, and it was believed

that the suspect may have suffered some burns when the fire was started.

On August the 13th[,] Adrian Henry was interviewed by detectives. The detectives observed burnt skin on his face and right arm. He also had several deep scratches on his chest and back that appeared that he had been in some type of a physical confrontation. Mr. Henry was asked what he was wearing when he went to see the victim at her place of employment on August the 12th. He stated he was wearing a gray tank top with some type of shorts. On August the 14th[, a] video surveillance tape was retrieved from the business Bob Evans Restaurant, and it showed Mr. Henry with Ms. Vit wearing the same white shirt and black pants she was wearing when her body was discovered. It also showed that Mr. Henry was wearing a gray tank top and white shorts.

On August the 14th[,] Mr. Henry was interviewed again. During both of the interviews with detectives[,] Mr. Henry was inconsistent in his statements regarding his burns and scratches. He stated that the place on his nose was from a sunburn. He stated that his ear was also sunburned. It did not appear to detectives that these were sunburns. He also stated that he burned his arm in a grease fire. When questioned about the fresh scratches on his chest and back, he stated it was from playing basketball several days earlier. The detectives observed the scratches appeared to be fresh and that some of the scratches were still clotting. He also stated that's how he got his nose scratched when he previously stated that it had been sunburned.

His statements about where he went after he met with Ms. Vit on August the 12th are also inconsistent with other witnesses Roderick (phonetic) and Robert Left.

Detectives also interviewed Darren Ricks (phonetic). He is the person who was driving by the field where the body was found and saw a black man leaving the field and get into a white van and drive away with the lights off. DNA was recovered under Ms. Vit's fingernails. This DNA was sent to Orchid Cellmark Lab. Barbara Leal[,] who tested the DNA[,] would

testify that the DNA belonged to either Mr. Henry or someone
in his paternal lineage.

The petitioner affirmed that he understood the plea agreement; that he understood the crimes with which he was charged and their potential punishment; that he and trial counsel had thoroughly discussed his case, including the discovery and potential witnesses; that he could not think of anything he had asked trial counsel to do that they had not done; that he was not under medication or having difficulty understanding what he was doing; and that he wished to waive his right to continue to trial and wanted instead to plead guilty.

## B. Facts from Post-Conviction Hearing

At the post-conviction hearing, Detective Lawrence Brown testified that he responded to the report of a body burning in a field at about 11:00 p.m. on August 12, 2010. The victim's identity was traced through the discovery of her father's burned van in the vicinity and confirmed through dental records. Detective Brown testified mainly to the circumstances under which the petitioner gave police a statement and permission to take a sample of his DNA.

Detective Brown testified that police discovered the petitioner was the victim's boyfriend after speaking with the victim's family and the manager of the restaurant where she worked. Detective Brown spoke to the petitioner either two or three times. Two video recorded interviews were admitted as late-filed exhibits to the post-conviction hearing. According to Detective Brown, the first interview took place on the morning of August 13, when he returned to the station after obtaining the victim's dental records and found the petitioner waiting in the lobby. Detective Brown testified that the petitioner "voluntarily came to the station on his own" and that he told police he had heard the victim's van was found and he wanted to help. The petitioner was interviewed about his relationship to the victim. Detective Brown testified that the petitioner was free to leave during this interview and that he did, in fact, leave the station on his own at the interview's conclusion.

A video of the August 13, 2010 interview was introduced into evidence at some time after the conclusion of the hearing. The petitioner told the detectives about his relationship with the victim and stated he had just given her $943 for her parents' rent, money he had obtained from selling his personal possessions. He accounted for his whereabouts at the time of the crime by telling detectives that he was playing poker with Roderick Left's father and a neighbor and that he later went to Wal-Mart with Mr. Left and his wife. The petitioner told police that he had last heard from the victim a little before 10:00 p.m. the night before and that she had lost her telephone charger.

-4-

The petitioner had free use of his phone during the first part of the interview, sending and receiving messages. When detectives informed him that the burned body was his girlfriend, he began to cry for some minutes. Detectives allowed him to leave the interview room to go outside to "get some air." The petitioner had offered his phone to the detectives during the first part of the interview. As they were leaving the interview room, the petitioner asked to make a call, and a detective asked him to "wait on phone calls for a minute," requesting to take the phone. When detectives and the petitioner returned to the room, the detectives asked him to turn off the phone to avoid interruptions. However, the petitioner nevertheless spoke to his brother during a later break. The petitioner made some equivocal references to obtaining counsel, including, "Do I need somebody here with me, or am I OK?" The petitioner executed a waiver of his rights. The petitioner interrupted to ask, "Can I stop right here? Anytime I want to stop, can I?" The detective answered, "Yeah, I'm going to get to that part," and then read the next few sections, including the right to stop answering questions. He later asked, "How long do I have to be here?" to which detectives responded, "You're here for [the victim]."

During the interview, the petitioner alluded to certain burn marks on his nose and ears, noting that his skin sunburns very easily and that the spots were sunburns, which had peeled off when he washed his face. He later told police the spot on his nose was a sore that had gotten infected and then sunburned. He also stated that a burn on his arm was a grease burn. The petitioner gave police permission to photograph his injuries. They also asked if he had any tattoos other than those visible on his arms. The petitioner responded that he had tattoos on his torso, and the officers asked him to remove his shirt so they could photograph the tattoos, at which point the officers noticed scratches on his chest and back. The petitioner stated he got the scratches while playing basketball and that his nose was also scratched while playing basketball. The petitioner agreed to give a DNA sample, and he told detectives he had last had sex with the victim on Tuesday. He also wrote a statement detailing everything he had done the day before. At the conclusion of the August 13, 2010 interview, the petitioner was not detained by police and left the station to go home.

Detective Brown testified that on August 14, 2010, police were at the house of the petitioner's friend, Roderick Left, and they asked Mr. Left to go to the station to give a statement. The petitioner, who happened to be present, volunteered to accompany them, and he rode to the station with Mr. Left. Detective Brown testified that police did not ask the petitioner to go to the station for this final interview. According to Detective Brown, "Mr. Henry basically placed himself in this case from day one."

The petitioner was not given further *Miranda* warnings during the second interview, which lasted a little over an hour and a half. He brought the white shorts he had been wearing the night of the crime and explained that there was a cigarette burn on them as he

handed them over to police. The detectives continued to question the petitioner about his relationship with the victim, his activities the night of the murder, and his wounds.

At one point, the petitioner requested to leave and was told to "hang on just a second" while a detective looked at his phone; the detective left the petitioner alone in the room with his phone. The petitioner asked to use the bathroom, and he requested to leave again and was told, "We'll see where they're at." The petitioner made a phone call in the interview room. The detectives returned and confronted him with inconsistencies between his statement and other evidence. The petitioner announced, "That's it, I think it's time for me to get an attorney." Police implied that he would then be arrested. The petitioner asked if he would be able to leave to get an attorney. During the remaining few minutes of the interview, the petitioner continued to deny his involvement when confronted with the implausibility of his claims about the burns and scratches on his body. The petitioner finally said, "I want to talk to an attorney, please." Detectives then placed him under arrest and refused to speak to him further, even when he tried to withdraw his request.

Detective Brown testified that he did not smell marijuana on the petitioner either day and that the petitioner was coherent and able to give a narrative of events. He denied asking the petitioner if he had "burned one" the prior day or saying he could smell "it" on the petitioner. Detective Brown testified that he did not use that phrase.

Detective Hanson also testified that he did not recall smelling marijuana on the petitioner and that petitioner did not appear to be under the influence of drugs. The petitioner had no difficulty articulating what he wanted to say. Detective Hanson did not remember asking the petitioner if he had "burned one."

The petitioner's lead trial counsel testified regarding his work investigating and litigating the case. Lead counsel testified that the petitioner was evaluated for competency by two experts; that his IQ was tested; and that trial counsel investigated mitigating evidence, including hiring an expert in substance abuse and emotional trauma. Experts determined that the petitioner was competent, and his IQ tested in the seventies. Trial counsel investigated trauma suffered by the petitioner in his youth, particularly the "troubling" facts regarding the petitioner's proceedings for his prior convictions, during which his juvenile transfer hearing was waived and he was sent to the penitentiary as a fourteen-year-old.

Lead counsel testified that the petitioner gave them the names of witnesses who the petitioner thought would provide favorable evidence. One of these witnesses, Mr. Left, refused to be interviewed and eluded contact with trial counsel even when they waited outside his home. Other witnesses changed their stories, and lead counsel felt some would not be credible to a jury. He testified that he went over the petitioner's and Mr. Left's

statements to the police in great detail and would have been aware of any inconsistencies.

Lead counsel denied that he coerced the petitioner into pleading guilty. Lead counsel testified that he discussed the case with the petitioner many times. He testified that he believed that the evidence was overwhelming, that the petitioner would be convicted, and that the best outcome from trial would be a conviction for a lesser-included offense. He talked to the petitioner "many, many" times about pleading guilty, but the petitioner did not want to plead guilty until right before trial. He denied telling the petitioner that he would never see the light of day or that his witnesses could be convicted of perjury. The State had filed a notice that it intended to seek a sentence of life without parole, and lead counsel told the defendant it was highly probable he would be convicted and sentenced to life without parole. Lead counsel stated that he spoke to the petitioner's family about the possibility of pleading guilty early in the proceedings but that, due to the petitioner's preferences, he and co-counsel did not contact the family about the plea bargain at the time that it was negotiated. He did not pressure the petitioner's family regarding a plea. Lead counsel recalled that the petitioner initiated the negotiations by contacting him in early December to express an interest in pleading guilty in exchange for a forty-year sentence.

Regarding the suppression of the evidence, lead counsel testified that he did not feel that there was a strong argument to suppress the statement to police. When it became clear that the case would go to trial, however, he and co-counsel drafted a motion to suppress and contacted the court to ensure the motion would be heard prior to trial. This motion was attached to the petition for post-conviction relief. However, before the motion was filed, the petitioner expressed an interest in pleading guilty, and trial counsel shifted focus to plea negotiations, opting not to file the motion. Lead counsel noted that even if the motion had been granted, there was overwhelming evidence pointing to the defendant as the perpetrator, including the burns on his face and arms, scratches on his chest and back, DNA found under the victim's fingernails, and video showing an argument with the victim on the evening of the crime. Lead counsel also noted that the prosecution had probable cause to obtain the petitioner's DNA, and any motion to suppress the DNA evidence would at most have delayed the proceedings.

Co-counsel confirmed much of lead counsel's testimony, including that over 176 hours were logged on the case and that the defense did not limit spending but, in fact, hired several expert witnesses. She did not recall any statements that money would not be spent on the case and testified that expending the necessary money and time "wasn't an issue for us." Trial counsel shared discovery with the petitioner's mother and with Shamiah McMillen Henry, petitioner's current wife. She and lead counsel discussed different theories and strategies with the petitioner.

Co-counsel testified that she never asked the petitioner's mother to persuade him to plead guilty and that the petitioner did not want her to be involved due to her health. The petitioner told trial counsel not to discuss the plea negotiations with his family or friends, and trial counsel did not do so. Co-counsel testified that several of the petitioner's family and friends only became aware that he had pled guilty when they saw it on the news and that they called the office afterward because they were surprised by the plea. The petitioner had contacted trial counsel through his current wife on December 8, 2011, regarding a plea, and trial counsel attempted to negotiate a plea before the trial date set for late January. The petitioner called again on January 3 to ask if the plea had been accepted, and he entered a plea on January 11. Co-counsel testified that on the morning of January 11, trial counsel met with the petitioner in a booth in the holding area and that the petitioner did not express doubt about his decision to plead guilty, although he was worried about media coverage. Co-counsel confirmed lead counsel's statements regarding the facts around the drafting and filing of the motion to suppress, noting that trial counsel did not file the motion because they were concerned that the opportunity to plead guilty would expire.

The petitioner's mother, Patricia Henry, testified that lead counsel asked her to ask the petitioner to plead guilty. She also testified that lead counsel told her that "it was political season and that they had already had somebody for the crime and they were not going to spend [any more] money on that trial." She told her son that no more money would be spent, and she felt he was under a lot of pressure when he pled guilty. She elaborated that this was in December 2011 and that trial counsel did not want to spend money because of the election for "the senate and all that kind of . . . elections." She testified that the petitioner did not want her to testify at trial because of her illness and that trial counsel did not predict any adverse consequences from her testimony. She opined that the crime "was a hate crime, and my son [doesn't] have that kind of hate in his heart."

Shamiah Henry, who was the petitioner's girlfriend at the time of the plea agreement and who subsequently married the petitioner, testified that she would have provided an alibi for the petitioner if trial counsel had called her to testify. According to the petitioner's wife, Mr. Left took the petitioner to the restaurant where the victim worked at around 4:30 or 5:00 p.m. At 7:00 p.m., she picked the petitioner up at Mr. Left's house, and they went to a Days Inn to have sexual intercourse. During intercourse, the petitioner's phone rang four or five times. Later, the phone rang again, and the petitioner answered it and put it on speaker phone. The petitioner's wife heard Mr. Left say in a panicked voice that the petitioner needed to return to the house, and she gave him a ride to Mr. Left's home. She also stated that she frequently scratched the petitioner during sex. On cross-examination, she acknowledged that she did not immediately give her alibi evidence, explaining that she was living with the father of her children at the time and did not want to get caught cheating. She testified that the petitioner was also involved with a third woman, the mother of his children,

at the time. The petitioner's wife at first testified that the petitioner had no burns on his body that night. She later amended her answer to say that he had "a burn before from cooking." She stated that he did not have burns on his nose, ear, and arm at the hotel.

The petitioner's wife also testified that trial counsel pressured her to tell the petitioner to plead guilty to life without parole. Although she claimed she was pressured several times, she also testified that she never told the petitioner to plead guilty because she did not believe he was guilty and because she felt it should be his decision. The petitioner's wife acknowledged that trial counsel investigated her testimony; trial counsel told her she would not be a credible witness.

The petitioner also testified regarding the performance of trial counsel and the circumstances of his plea. He testified that trial counsel told him that the witnesses he wanted to be present at trial would not be credible and that they could be charged with perjury. He acknowledged that his wife's testimony was inconsistent with the statement Mr. Left gave to the police and with his own statement to police. He also admitted that "[w]hat Mr. Roderick told the police is something we decided together to tell the police." He testified that he did not tell police he was with his wife, stating, "[B]ecause at the time I did not recollect – I didn't remember that part. I did not even actually know what time they said all this had happened." He elaborated that he was not sure if it was relevant because he did not know the timeline and that he did not want her to get caught cheating. He stated at the post-conviction hearing that the scratches police found on his chest and back could have come from basketball or sex. He also stated that the wound on his nose was not a burn but an injury from doing cocaine, which was exacerbated by sun exposure. The wound on his ear "could have come from . . . cooking, too." He stated that Mr. Left and "three other guys" were involved in the victim's death, which was motivated by $24,000 that he had given her that day. Mr. Left called the hotel because the men wanted to "get" the petitioner, too. He lied in his statement to police in order to protect Mr. Left and Mr. Left's family from these men. He explained that his DNA might have been under the victim's fingernails because he had sex with her on Wednesday.

The petitioner testified that he felt coerced into pleading guilty. He had initially rejected a forty-five year plea offer. He claimed that trial counsel then talked to his family, including his two girlfriends and his mother, about pleading guilty. The petitioner stated that he never talked to his family about pleading guilty "because it was understood I wasn't going to plead guilty," but he did talk to them about not pleading guilty. He stated that he did not know about the plea offer until he met with lead counsel in the "booth" prior to the hearing and that he only had fifteen minutes to consider the offer. He felt that he had no choice because lead counsel had told him he could not win at trial and that his witnesses were not credible. He had told the court that he was acting voluntarily and was not coerced because

-9-

he was "in a zombie[-]type trance."

The petitioner also testified regarding the circumstances of his statement to police. He testified that he did not go to the police station of his own initiative. Instead, after trying to contact the victim, he called the restaurant and was told police were looking for him and had left their cards for him. He called the contact information given to him by the restaurant and left messages, and he was asked to come to the station by law enforcement when they returned his calls. He was afraid that not contacting the police would have consequences for his parole. The petitioner testified that, during the first interview, he was under the influence of marijuana, describing his impairment as a "thirty" on a scale from one to ten, and he stated he was even more under the influence the second day. He acknowledged that he never admitted being involved with the crime during the interviews.

The post-conviction court denied the petition. In its detailed findings of fact, the court credited trial counsel's testimony regarding the investigation of the case and the assessment of witness credibility. The post-conviction court specifically found that the petitioner's tale that "three other guys" killed the victim lacked credibility, and it noted that two of the witnesses the petitioner faulted trial counsel for not presenting did not testify at the post-conviction hearing. The post-conviction court found that trial counsel did not coerce the petitioner into pleading guilty, that trial counsel secured funding for three medical experts, and that significant time and money were spent on the case. The post-conviction court found that trial counsel kept the petitioner informed about the case and possible strategies. The court also found that the petitioner's friends and family did not pressure him to plead guilty, as they were unaware of the plea negotiations. The post-conviction court concluded, "In short, [p]etitioner did not like his options[;] he did not want to enter a plea[,] yet he did not have any evidence or witnesses to contradict the State's evidence that he was present at the crime scene when the victim was killed." The court further found that the plea was knowing and voluntary based on the petitioner's statements made at the time the plea was entered. Regarding the motion to suppress, the post-conviction court again credited the testimony of trial counsel. The post-conviction court found that it would not have suppressed the evidence because the petitioner was not in custody during either interview, because the waiver was valid for the first and second interviews, because the defendant's waiver was not invalidated by intoxication or mental impairment, and because the State had probable cause to obtain the petitioner's DNA. The petitioner now appeals.

## II. Analysis

On appeal, the petitioner argues that his constitutional rights were violated when he was not given proper *Miranda* warnings and when he was interviewed while under the influence of marijuana. The petitioner also argues that he received the ineffective assistance

of counsel when trial counsel: (1) failed to communicate the defense strategy, defenses, or theory of the case with the petitioner; (2) failed to file a motion to suppress the petitioner's statements to law enforcement; (3) failed to utilize important witnesses; and (4) pressured the petitioner into pleading guilty. The petitioner argues that due to these errors, his guilty plea was not knowingly and voluntarily entered. The State responds that the petitioner received the effective assistance of counsel and that the petitioner's plea was voluntary.

In order to obtain post-conviction relief, the petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010). The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). Whether a guilty plea was knowing and voluntary and whether the petitioner received the ineffective assistance of counsel are mixed questions of fact and law. *Id.*; *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Legal issues and mixed issues of fact and law are reviewed de novo without any presumption of correctness. *Vaughn*, 202 S.W.3d at 115.

## A.  Interviews as Constitutional Violation

To the extent that the petitioner alleges a free-standing constitutional violation separate from his ineffective assistance of counsel claim regarding his interviews, the petitioner is without relief. Post-conviction relief is available only where a judgment is void or voidable due to an abridgement of the petitioner's rights. Any violation of the petitioner's constitutional rights during custodial interrogation in this case does not render the judgment void or voidable; it simply determines what evidence would have been admissible had the case gone to trial. Accordingly, this allegation is not, in itself, a ground for post-conviction relief. *See State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999) ("[T]he voluntary entry of an informed and counseled guilty plea constitutes an admission of all facts necessary to convict and waives all non-jurisdictional defects and constitutional irregularities which may have existed prior to the entry of the guilty plea.").

## B.  Ineffective Assistance of Counsel

The Post-Conviction Procedures Act provides relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel, and the denial of the effective assistance of counsel is a proper ground for post-conviction relief. *Vaughn v. State*, 202 S.W.3d 106, 115-16 (Tenn. 2006). The right to counsel "encompasses the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in

-11-

criminal cases.'" *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Failure to show either deficiency or prejudice precludes relief. *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011). Deficiency can be shown by proving that counsel's acts or omissions were so serious that they fell outside an objective standard of reasonableness under prevailing professional norms. *Vaughn*, 202 S.W.3d at 116. "Upon our review of counsel's performance, 'we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time.'" *Finch*, 226 S.W.3d at 316 (quoting *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006)). In evaluating counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. The defendant's own statements and actions may determine the reasonableness of counsel's actions. *Felts*, 354 S.W.3d at 277.

To show prejudice, the petitioner must show a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. *Vaughn*, 202 S.W.3d at 116. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland,* 466 U.S. at 694).

When a petitioner challenges his guilty plea on the basis of ineffective assistance of counsel, the petitioner must prove deficient performance and that "'there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.'" *Grindstaff v. State*, 297 S.W.3d 208, 216-17 (Tenn. 2009) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

### 1. Failure to Communicate

The petitioner argues that trial counsel was ineffective for failing to communicate the defense strategy, defenses, or theory of the case with him. The petitioner argues that had he known the defense strategy he would have known to question the handling of his case during the plea negotiations.

The post-conviction court found that trial counsel kept the petitioner informed about the case and possible strategies. The testimony of trial counsel, which was credited by the trial court, also indicated that the petitioner was informed regarding trial strategy. Trial counsel recalled discussing the defense strategy and the likely outcome at trial with the petitioner. Furthermore, during the petitioner's plea colloquy, the petitioner indicated that trial counsel had discussed the case with him thoroughly, including the discovery, defenses, and potential witnesses. The petitioner has failed to show that trial counsel acted deficiently in communicating with him regarding the case or that he suffered any prejudice.

## 2. Failure to File a Motion to Suppress

The petitioner also faults trial counsel for failing to move to suppress his statement to police and his DNA. The petitioner argues that he was not properly given *Miranda* warnings despite being interrogated in police custody. He also claims he was intoxicated at the time the statements were taken and that police did not allow him to leave or cease questioning him when he requested an attorney. The evidence credited by the post-conviction court showed that a motion to suppress was prepared and that trial counsel were in the midst of scheduling a hearing on the motion when the petitioner expressed a desire to initiate plea negotiations. Trial counsel did not file the motion because they shifted their focus to negotiating the plea. The post-conviction court also found that the petitioner was not intoxicated, a finding which is conclusive on appeal unless the evidence preponderates otherwise. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010).

When a petitioner who pled guilty alleges deficiency in the failure to suppress evidence, the court may consider the likelihood that the motion to suppress would have succeeded and whether suppression would have led the attorney to change his or her recommendation regarding the plea. *See Lueptow v. State*, 909 S.W.2d 830, 832-33 (Tenn. Crim. App. 1995). We conclude, however, that it is unnecessary to decide the merits of a motion to suppress petitioner's statement or whether trial counsel's recommendation regarding the plea would have changed because the petitioner has failed to prove prejudice.

The petitioner's statements to police were not determinative of his decision to plead guilty. The petitioner's statements were only marginally useful to the prosecution insofar as he presented inconsistent explanations for his wounds and insofar as his statements conflicted with those of any alibi witness he may have later developed and wanted to present. He never admitted to committing the crime during either interview. Furthermore, the prosecution had other, more conclusive proof of the petitioner's involvement, including a video of him and the victim at the restaurant on the evening of the crime, scratches on the petitioner's chest

and back, burn marks on his ear, nose, and arm,[1] information from the fire marshal that the perpetrator would have burns, and DNA from the petitioner or someone in his paternal lineage under the victim's fingernails. The petitioner was facing a possible sentence of life without parole, and he chose instead to plead guilty in exchange for a forty-year sentence. We further note that trial counsel did, in fact, draft a motion to suppress and was in the process of filing it when they were diverted by the petitioner's expressing a desire to enter into plea negotiations. This circumstance suggests that the suppression of evidence played a negligible role in the petitioner's decision to plead guilty. Having considered the nature of the evidence sought to be suppressed, the other evidence available to the prosecution, and the circumstances surrounding the guilty plea, we conclude that, even if we were to assume that the motion to suppress should have been filed and would have succeeded, the petitioner has failed to establish that "there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Grindstaff*, 297 S.W.3d at 217 (quoting *Lockhart*, 474 U.S. at 59). Because the petitioner cannot establish prejudice, we will not consider whether trial counsel's decision to file the motion close in time to the trial or whether trial counsel's decision not to file the motion during plea negotiations was ineffective assistance, although we note that the petitioner introduced no evidence that the motion could not have been filed and heard prior to trial had he decided not to plead guilty. We also note that trial counsel's decision not to file the motion after the petitioner expressed an interest in pleading guilty was a strategic one. *See Strickland*, 466 U.S. at 690-91.

The petitioner likewise objects to trial counsel's failure to suppress the DNA evidence obtained while he was in custody, but he cannot show either deficiency or prejudice in trial counsel's failure to suppress this evidence because, as lead counsel noted at the hearing, even if the court had found that the defendant's consent to give a DNA sample was not valid, the State had probable cause to obtain another sample through a warrant. The petitioner therefore cannot show either that failure to suppress the evidence was deficient or that there is a reasonable probability that he would not have pled guilty had a motion to suppress the DNA been filed.

### 3. Failure to Utilize Witnesses

---

[1] We note that the burns on the petitioner's ear, nose, and arm were clearly visible to detectives during the interviews, and that this evidence is accordingly not subject to suppression regardless of the circumstances under which the interviews were conducted. The evidence of the scratches on his torso was likewise nontestimonial evidence which was obtained without coercion and after the petitioner was advised of his right to remain silent during the first interview. *See State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013).

The petitioner asserts that his decision to plead guilty was influenced by trial counsel's representation that some of the petitioner's witnesses, including alibi witnesses, could not testify because they would not be credible and could be charged with perjury.

Generally, a petitioner will not be able to establish prejudice pursuant to a claim that counsel failed to investigate or present a witness unless the witness testifies at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Neither Mr. Left nor the petitioner's brother testified at the post-conviction hearing, and the petitioner therefore cannot demonstrate any prejudice from any alleged deficiency in trial counsel's investigation related to these witnesses.

Both the petitioner's mother and his wife testified at the hearing. The petitioner's mother testified that she was available to testify at trial but did not expect to do so because the petitioner wanted to protect her due to her health. She testified trial counsel did not tell her that testifying would have any adverse results for her or the petitioner. The substance of her testimony did not address the State's evidence but consisted of the opinion that her son did not have the kind of hate in his heart necessary to commit the crime. She also made an allegation that trial counsel had told her that no more resources would be expended on the case due to an upcoming election.

The petitioner's wife testified that trial counsel told her that her testimony would not be credible to a jury. She then proceeded to testify that the petitioner had been with her on the night of the crime, that she had scratched him during sex, and that he had left after a panicked Mr. Left called him numerous times. She testified that she picked up the petitioner around 7:00 p.m. but did not testify regarding how long he was with her. The victim's body was found at around 11:00 p.m. The petitioner's wife did not explain how he got burn marks on his face, and her testimony established that he was not burned when he was with her at the hotel; she later amended this testimony to say he had some burns from cooking but not on his nose, ear, or arm. The petitioner's wife's testimony conflicted with the petitioner's own statement to police regarding his whereabouts. Trial counsel's prediction that the trier of fact would question her credibility proved correct, as the post-conviction court found that there were not "any credible alibi witnesses to show that Petitioner was not with the victim at the time she was killed."

Both lead counsel and co-counsel testified regarding the investigation of the case. Trial counsel testified that over 176 hours were spent on the case, that three expert witnesses were hired, that trial counsel attempted to contact all the witnesses whose names the petitioner had provided, that trial counsel interviewed those witnesses who cooperated, and that trial counsel communicated with the petitioner regarding case strategies and witnesses. Trial counsel also testified that they did not mention perjury to the witnesses but provided

the witnesses and the petitioner with an honest assessment of the likelihood that a jury would find the proffered testimony not credible. Co-counsel testified that there were no issues regarding funding for the petitioner's case. The post-conviction court found that the testimony of trial counsel on these matters was credible, a determination that is binding on this court unless the evidence preponderates otherwise. Accordingly, the petitioner cannot show deficiency with respect to trial counsel's investigation of the case. Considering the nature of the testimony of the witnesses, neither has he demonstrated a reasonable probability that he would not have pled guilty had trial counsel advised him to present the testimony of these witnesses.

### 4. Pressure to Plead Guilty

The petitioner next asserts that trial counsel were deficient in pressuring him to plead guilty. However, the post-conviction court found that trial counsel did not coerce the petitioner into pleading guilty and that the petitioner's friends and family did not pressure him to plead guilty, as they were unaware of the plea negotiations.

Trial counsel testified that they never pressured either the petitioner or his friends and family regarding a guilty plea; rather, the petitioner, less than two months before trial, contacted them to express interest in negotiating a plea. Trial counsel discussed the possibility of a plea with the petitioner's family early in the case but that, pursuant to the petitioner's wishes, they never discussed the plea negotiations with his family while the negotiations were taking place. Co-counsel testified that the petitioner's family and friends were surprised by the entry of the guilty plea and called the office because the petitioner evidently had not told them he was planning to plead guilty. The petitioner's wife testified that trial counsel pressured her to convince the petitioner to plead guilty; however, she also testified that she never did so. The petitioner's mother testified that lead counsel asked her to tell the petitioner to plead guilty because no more money would be spent on his case and that she told the petitioner what lead counsel had said. The petitioner testified that trial counsel pressured his family but also that he never talked to his family about pleading guilty "because it was understood I wasn't going to plead guilty." The petitioner stated he talked to his family about not pleading guilty. The post-conviction court credited trial counsel's testimony that they did not pressure the petitioner or his friends or family regarding the guilty plea. Accordingly, trial counsel's performance was not deficient. Also, the petitioner's and his wife's testimony that the alleged pressure from trial counsel was not conveyed to the petitioner shows that the petitioner suffered no prejudice.

### C. Voluntariness of Plea

Insofar as the petitioner also challenges his plea on the basis that it was not knowing

and voluntary, we conclude he is not entitled to relief. The petitioner argues that because of trial counsel's deficiencies his plea was not knowingly and voluntarily entered and that he would not have entered his guilty plea had he received effective assistance of counsel.

A guilty plea is only valid if it is voluntarily, understandingly, and knowingly entered. *Howell v. State*, 185 S.W.3d 319, 330 (Tenn. 2006). "In determining whether a guilty plea was knowingly and voluntarily entered, the standard, of course, is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Grindstaff v. State*, 297 S.W.3d 208, 218 (Tenn. 2009) (quoting *Jaco v. State*, 120 S.W.3d 828, 831 (Tenn. 2003)). Prior to accepting a guilty plea, the trial court must conduct an inquiry into the defendant's understanding of the proceedings to ensure the plea is knowing and voluntary. *Grindstaff*, 297 S.W.3d at 218 & n.11.

The transcript of the plea hearing shows that the trial court conducted a thorough examination of the petitioner to ensure that the petitioner understood the rights he was waiving in entering the plea. During this colloquy, the petitioner indicated that trial counsel had discussed the case with him thoroughly, including the discovery, defenses, and potential witnesses. The testimony of trial counsel, which was credited by the trial court, also indicated that the petitioner was informed regarding trial strategy. While the petitioner testified that he only had fifteen minutes to consider the plea, trial counsel testified that the petitioner first suggested negotiating a forty-year sentence approximately one month before the plea hearing. The petitioner's testimony that trial counsel pressured him to plead guilty was likewise contradicted by trial counsel. The post-conviction court credited trial counsel's testimony. The petitioner was aware of the potential sentence of life without parole.

Factors to be considered in evaluating the voluntariness of a plea include:

> (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; (4) the advice of counsel and the trial court about the charges and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

*Grindstaff*, 297 S.W.3d at 218 (quoting *Howell*, 185 S.W.3d at 330-31). In this case, while trial counsel testified that the petitioner's IQ was in the seventies, all other factors suggest that the plea was voluntary. The petitioner was familiar with criminal proceedings, having pled guilty to two prior felonies. Trial counsel conferred with the petitioner throughout the case, discussed alternatives, and were prepared to proceed to trial. The petitioner initiated

the plea negotiations and had over a month to consider the possibility of pleading guilty in exchange for a forty-year sentence. Trial counsel correctly informed petitioner regarding the potential sentence and the sentence to which he was agreeing. The abundant evidence against the petitioner was a strong inducement to plead guilty in order to avoid a greater penalty. Accordingly, we conclude that the plea was knowing and voluntary.

## CONCLUSION

Based on the foregoing analysis, we conclude that the petitioner's judgment is not void or voidable, and we affirm the judgment of the post-conviction court.


_____
JOHN EVERETT WILLIAMS, JUDGE